01/15/2008   17:24   2133836772                         IAS                                    PAGE   03/06

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George King and the assigned discovery Magistrate Judge is Alicia G. Rosenberg.

The case number on all documents filed with the Court should read as follows:

## CV08- 251 GHK (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

BEN WEBER, Individually and on Behalf of All
Others Similarly Situated,

PLAINTIFF(S)

v.

COUNTRYWIDE FINANCIAL CORPORATION, ANGELO R. MOZILO, KATHLEEN
BROWN, HENRY G. CISNEROS, JEFFREY M. CUNNINGHAM, ROBERT J.
DONATO, MICHAEL E. DOUGHERTY, BEN M. ENIS, EDWIN HELLER, STANFORD
L. KURLAND, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON,
KEITH P. RUSSELL, HARLEY W. SNYDER, MARSHALL M. GATES, AND JOHN
AND JANE DOES 1-60

DEFENDANT(S).

**CASE NUMBER**

CV08-00251 GHK (AGRx)

**SUMMONS**

TO:     DEFENDANT(S):    COUNTRYWIDE FINANCIAL CORPORATION, ANGELO R. MOZILO, KATHLEEN BROWN, HENRY G. CISNEROS,
JEFFREY M. CUNNINGHAM, ROBERT J. DONATO, MICHAEL E. DOUGHERTY, BEN M. ENIS, EDWIN HELLER,
STANFORD L. KURLAND, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. RUSSELL,
HARLEY W. SNYDER, MARSHALL M. GATES, AND JOHN AND JANE DOES 1-60

A lawsuit has been filed against you.

Within ___20___ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, Francis M. Gregorek, Esq. _____ whose address is
750 B Street, Suite 2770, San Diego, CA 92101 _____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated:  JAN 1 5 2008

By: _____  **LA'REE HORN**

Deputy Clerk

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed
60 days by Rule 12(a)(3)].*

01/15/2008   17:24   2133836772                    IAS                              PAGE  06/06

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
BEN WEBER, Individually and on Behalf of All Others Similarly
Situated

**DEFENDANTS**   COUNTRYWIDE FINANCIAL CORPORATION, ANGELO R. MOZILO, KATHLEEN BROWN, HENRY G. CISNEROS, JEFFREY M. CUNNINGHAM, ROBERT J. DONATO, MICHAEL E. DOUGHERTY, BEN M. ENIS, EDWIN HELLER, STANFORD L. KURLAND, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. RUSSELL, HARLEY W. SNYDER, MARSHALL M. GATES  AND JOHN AND JANE DOES 1-60

**(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):
Collin County

County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):
Los Angeles, CA

**(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
750 B Street, Suite 2770, San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

Attorneys (If Known):

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)
ERISA §404(1)(XA), 29 U.S.C. §1104 (a)(1)(A); ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); ERISA §502, 29 U.S.C. §1132;

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☑ 850 Securities/Commodities /Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s):

**FOR OFFICE USE ONLY:**   Case Number:

CV-71 (07/05)                          CIVIL COVER SHEET                        Page 1 of 2

# CV08-00251

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET
#### AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☐ No  ☑ Yes

If yes, list case number(s): 07-0134J-R GK (CT), 07-05879-RGK (CT), 07-05986-RGK (CT), 07-01050-DOC (RNB), 07-06027-RGK (CT), 07-06059-RGK (CT), 07-06062-RGK (CT), 07-06096-RGK (CT), 07-06190- RGK (CT), 07-06252- RGK (CT), 07-06410- RGK (CT), 07-06473- RGK (CT), 07-01183-CJC (AN); 07-06695- RGK (CT), 07-07243-RGK (CT);

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☑ A.  Arise from the same or closely related transactions, happenings, or events; or

☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.  Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** List the California County, or State if other than California, in which **EACH** named plaintiff resides (Use an additional sheet if necessary)

☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

Ben Weber - Texas

List the California County, or State if other than California, in which **EACH** named defendant resides.  (Use an additional sheet if necessary)

☐ Check here if the U.S. government, its agencies or employees is a named defendant.

Countrywide Financial Corporation - a Delaware corporation headquartered in Los Angeles

**List the California County**, or  State if other than California, in which **EACH** claim arose.  (Use an additional sheet if necessary)

Note: In land condemnation cases, use the location of the tract of land involved.

Los Angeles County

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** *Rachele R. Rickert*    Date    January 15, 2008

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

1 | FRANCIS M. GREGOREK (144785)
  | gregorek@whafh.com
2 | BETSY C. MANIFOLD (182450)
  | manifold@whafh.com
3 | RACHELE R. RICKERT (190634)
  | rickert@whafh.com
4 | MARISA C. LIVESAY (223247)
  | livesay@whafh.com
5 | WOLF HALDENSTEIN ADLER
  |    FREEMAN & HERZ LLP
6 | 750 B Street, Suite 2770
  | San Diego, CA 92101
7 | Telephone:  619/239-4599
  | Facsimile:  619/234-4599
8 |
9 | [Additional Counsel Appear On Signature Page]

10 | Attorneys for Plaintiffs

11 | UNITED STATES DISTRICT COURT

12 | CENTRAL DISTRICT OF CALIFORNIA

13 | WESTERN DIVISION

14 | BEN WEBER, Individually and on          ) Case No.:   **CV08-00251**
   | Behalf of All Others Similarly Situated, )
15 |                                          )
16 |                     Plaintiff,           ) **CLASS ACTION COMPLAINT** GH|
   |                                          ) **FOR VIOLATIONS OF THE**
17 | vs.                                      ) **EMPLOYER RETIREMENT**
   |                                          ) **INCOME SECURITY ACT**        (AGR)
18 |                                          )
19 | COUNTRYWIDE FINANCIAL              )
   | CORPORATION, ANGELO R.             )
20 | MOZILO, KATHLEEN BROWN,            ) **JURY TRIAL REQUESTED ON**
   | HENRY G. CISNEROS, JEFFREY M.      ) **ALL ISSUES SO TRIABLE**
21 | CUNNINGHAM, ROBERT J.              )
   | DONATO, MICHAEL E.                 )
22 | DOUGHERTY, BEN M. ENIS, EDWIN      )
   | HELLER, STANFORD L. KURLAND,       )
23 | MARTIN R. MELONE, ROBERT T.        )
   | PARRY, OSCAR P. ROBERTSON,         )
24 | KEITH P. RUSSELL, HARLEY W.        )
   | SNYDER, MARSHALL M. GATES,         )
25 | and JOHN AND JANE DOES 1-60        )
   |                                    )
26 |                                    )
27 |                     Defendant(s).  )
28 |

## PRELIMINARY STATEMENT

Plaintiff, individually and on behalf of the Countrywide Financial Corporation 401(k) Saving and Investment Plan, as amended and restated effective January 1, 1997, and all subsequent amendments (the "Plan") and a class of all others similarly situated (as defined below), by his undersigned attorneys, makes the following allegations based upon the investigation of his counsel, except as to the allegations pertaining specifically to Plaintiff and Plaintiff's counsel, which are based on personal knowledge. The investigation conducted by Plaintiff's counsel included, *inter alia*, a review and analysis of: (i) public filings including, but not limited to, Countrywide Financial Corporation ("Countrywide" or the "Company") Securities and Exchange Commission ("SEC") and United States Department of Labor filings; (ii) publicly-available news articles and reports; (iii) analysts' reports and advisories about the Company; and (iv) press releases issued by Defendants.

## INTRODUCTION

1.     Plaintiff is a participant in the Plan pursuant to §3(7) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1002(7). Plaintiff's retirement accounts in the Plan included Countrywide common stock ("Countrywide Stock" or "Company Stock"), which was one of the investment options offered by the Plan.

2.     As described herein, the Plan, and consequently plaintiff and the other participants and beneficiaries of the Plan, suffered millions of dollars of losses due to the malfeasance of the Defendants alleged herein as Countrywide Stock steadily declined in value. Defendants breached their fiduciary obligations imposed by ERISA and owed to the Plan and all of the Plan's participants and beneficiaries, including plaintiff.

3.     Plaintiff brings this suit as a civil enforcement action under §502 of ERISA, 29 U.S.C. §1132, against the Plan fiduciaries for relief on behalf of the Plan.

4.     The Plan is a defined contribution retirement plan that is intended to qualify under §401(a) of the Internal Revenue Code of 1986 (the "Code") and is subject to the provisions of ERISA.

5.     From January 1, 2006, through the present (the "Class Period"), the Plan significantly invested in Countrywide Stock.

6.     Plaintiff was a participant in the Plan during the Class Period. Plaintiff's retirement accounts pursuant to the Plan included Countrywide Stock during the Class Period.

7.     Defendants, as fiduciaries of the Plan, violated ERISA and breached their fiduciary duties to the Plan, to the plaintiff, and to the other participants and beneficiaries of the Plan in connection with the Plan's investment in and holdings of Countrywide Stock.

8.     Throughout the Class Period, the Defendants caused or permitted the Plan to imprudently offer, purchase, and hold Countrywide Stock.  Defendants violated ERISA because it was imprudent for the Plan to do so, because, among other reasons, Countrywide was highly invested in the very risky subprime securities market that made it an imprudent retirement investment.  These improper activities caused the price of Countrywide Stock to rise above its true value.

9.     During the Class Period, Defendants had conflicting loyalties between maintaining a high price for Company Stock, in part because of their own holdings and sales of Countrywide Stock and in part because of their positions as directors or senior officers of the Company, and the interests of the Plan participants and beneficiaries, which should have included the timely receipt of accurate information concerning the Company's financial performance and diversification out of investments, like Countrywide Stock, that were both overvalued and lacked a reasonable prospect for growth due to Countrywide's deteriorating portfolio.

10.    In further breach of their fiduciary duties, Defendants neither properly monitored the Plan's investment in Countrywide Stock nor provided accurate

information to Plan participants and beneficiaries concerning Countrywide's financial performance.   Because of Defendants' failure to provide accurate information, Plan participants lacked the proper knowledge to make informed decisions concerning their retirement investments.

11.   During the Class Period, Countrywide Stock lost approximately 89% of its value.  Plaintiff and all Plan participants who had acquired and held Company Stock suffered as the value of their retirement accounts invested pursuant to the Plan dropped precipitously in line with the decline in the price of Company Stock.

12.   Defendants are liable under ERISA to restore losses sustained by the Plan resulting from the breach of their fiduciary obligations.

## JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(l), 29 U.S.C. §1132(e)(l).

14.   Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because this is the district where some or all of the breaches took place, where one or more Defendants reside or may be found, and/or where the acts and transactions alleged herein, including the administration of the Plan, occurred.

## PARTIES

15.   Plaintiff is a resident of Plano, Texas.  At all relevant times herein Plaintiff was an employee of Countrywide.  During the Class Period, he directed the Plan to purchase and hold Countrywide Stock in his retirement account pursuant to the Plan during the Class Period.

16.   Defendant Countrywide is incorporated in the state of Delaware and maintains its executive offices at 4500 Park Granada Blvd., Calabasas, California 91302.  The Company's stock trades on the New York Stock Exchange under the ticker symbol "CFC."  Countrywide is a diversified financial services company focused primarily on real estate finance and related activities.  The Company

manages its business through five business segments: Mortgage Banking; Banking; Capital Markets; Insurance; and Global Operations. The Mortgage Banking business segment is Countrywide's core business and generated 48% of the Company's pre-tax earnings in 2006.

17. Throughout the Class Period, Countrywide was the Plan sponsor, a fiduciary of the Plan within the meaning of ERISA, and acted within its capacity as a Plan fiduciary. Rather than delegate all fiduciary responsibility to external service providers, Countrywide chose to internalize at least some of these fiduciary functions. Thus, Countrywide had (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.

18. Upon information and belief, Countrywide at all times acted through its officers, employees, and members of its retirement committee (the "Plan Committee"), who performed Plan related fiduciary functions in the course and scope of their employment and/or service to the Company. Upon information the members of the Plan Committee are:

a) Defendant Angelo R. Mozilo ("Mozilo") has served as Chairman of the Board since March 1999 and as the Chief Executive Officer of Countrywide since February 1998. During the Class Period, Defendant Mozilo sold over 6 million shares of Company Stock for proceeds of approximately $242 million.

b) Defendant Kathleen Brown ("Brown") served as a Director of Countrywide from 2005 until her resignation from the Board effective March 29, 2007.

c) Defendant Henry G. Cisneros ("Cisneros") has served as a Director of Countrywide since 2001. During the Class Period, Defendant Cisneros sold over 79,000 shares of Company Stock for proceeds of approximately $3 million.

d)      Defendant Jeffrey M. Cunningham ("Cunningham") has served as a Director of Countrywide since 1998. During the Class Period, Defendant Cunningham sold approximately 75,000 shares of Company Stock for proceeds of approximately $3 million.

e)      Defendant Robert J. Donato ("Donato") has served as a Director of Countrywide since 1993. During the Class Period, Defendant Donato sold approximately 54,000 shares of Company Stock for proceeds of approximately $2.1 million.

f)      Defendant Michael E. Dougherty ("Dougherty") served as a Director of Countrywide from 1998 until June 2007. During the Class Period, Defendant Dougherty sold approximately 227,905 shares of Company Stock for proceeds of approximately $9.2 million.

g)      Defendant Ben M. Enis ("Enis") served as a Director of Countrywide from 1984 until his resignation from the Board effective June 2006.

h)      h.      Defendant Edwin Heller ("Heller") served as a Director of Countrywide from 1993 until his resignation from the Board effective June 2006. During the Class Period, Defendant Heller sold approximately 106,500 shares of Company Stock for proceeds of approximately $4 million.

i)      Defendant Stanford L. Kurland ("Kurland") served as a Director of Countrywide from 1999 until his resignation from the Company effective September 7, 2006. Defendant Kurland also served as the President of the Company from 2004 until his resignation and served as the Chief Operating Officer ("COO") of the Company from 1988 until his resignation. Defendant

1
2
3
4
5
6
7
8
9

Kurland served in a number of other executive positions during his tenure at the Company, including Executive Managing Director from 2000 to 2003 and Senior Managing Director from 1989 to 2000.  In addition, Defendant Kurland served as the Chairman and Chief Executive Officer of the Company's principal operating subsidiary, Countrywide Home Loans, Inc. During the Class Period, Defendant Kurland sold over 400,000 shares of Company Stock for proceeds of approximately $15 million.

10
11

j)   Defendant Martin R. Melone ("Melone") has served as a Director of Countrywide since 2003.

12
13

k)   Defendant Robert T. Parry ("Parry") has served as a Director of Countrywide since 2004.

14
15
16
17

l)   Defendant Oscar P. Robertson ("Robertson") has served as a Director of Countrywide since 2000. During the Class Period, Defendant Robertson sold approximately 152,000 shares of Company Stock for proceeds of approximately $6 million.

18
19

m)   Defendant Keith P. Russell ("Russell") has served as a Director of Countrywide since 2003.

20
21
22
23

n)   Defendant Harley W. Snyder ("Snyder") has been a member of Countrywide's Board of Directors since 1991. During the Class Period, Defendant Snyder sold approximately 170,000 shares of Company Stock for proceeds of approximately $6.5 million.

24
25
26
27
28

o)   Defendant Marshall M. Gates ("Gates") is the Senior Managing Director and Chief Administrative Officer for Countrywide. Mr. Gates oversees the Company's administrative functions within the human resources, corporate procurement, real estate administration and insurance risk management areas. During the

Class Period, Mr. Gates made approximately $2,678,576.71 from trading Countrywide Stock and has been with the Company since 1988.

19.   During the Class Period, Defendants Mozilo, Cisneros, Cunningham, Donato, Dougherty, Gates, Heller, Kurland, Robertson, and Snyder performed Plan related fiduciary functions in the course and scope of their employment and/or service to the Company

20.   John Does 1 to 60 are the members of the Plan Committee whose names are not currently known and who, on information and belief, were employees and senior executives at Countrywide who served on the Plan Administrative Committee in the ordinary course of their employment and, by virtue of their senior positions within the Company, knew or should have known all of the facts alleged herein.

## THE PLAN

21.   The Company sponsors the Plan.  The Plan is an "employee pension benefit plan," as defined by §§3(2)(A) and 3(3) of ERISA, 29 U.S.C. §§1002(2)(A) and 1002(3).  The Plan is not a party to this action.  Pursuant to ERISA, however, the relief requested is for the benefit of the Plan.

22.   The Plan is a defined contribution plan that became effective January 1, 2004, and covers eligible employees, as defined in the Plan agreement.  Each year, participants may contribute up to 40% of pre-tax annual compensation, as defined in the Plan document.   Participants may also contribute amounts representing distributions from other qualified defined benefit or defined contribution plans.  Highly compensated employees are limited to 6% of pre-tax annual compensation.  The Company makes a discretionary matching contribution currently equal to 50% of the first 6% of eligible earnings that the participant contributes.

23.   The Plan was amended in November 2006 so that Employer Matching Contributions were to be made in Company Stock.

- 7 -

24.     Participants are immediately vested in their voluntary contributions plus actual earnings thereon.  Vesting in the Company's discretionary matching contribution portion of their accounts plus actual earnings thereon is based on years of service.  Participants begin vesting in Company contributions after one year of service and are fully vested after five years of service.

25.     The Company is the Plan's sponsor.  Fidelity Investments ("Fidelity") is the trustee of the Plan.  The Plan's investments are held in a trust fund administered by Fidelity Investments.

26.     The Plan is intended to qualify as a salary reduction plan under §401(k) of the Code, as amended, and as a qualified defined contribution plan under §401(a) of the Code.

27.     Substantially all Company contributions are required to be initially invested in Company Stock.  Thereafter, such investments are entirely participant-directed.  Company Stock is also available as a separate investment option for Plan participants.  Participants may also contribute amounts representing distributions from other qualified pension plans in the form of rollover contributions.

28.     As of December 31, 2005, immediately prior to the commencement of the Class Period, the Plan held approximately 8,761,695 shares of Company Stock worth approximately $269,635,000.

29.     Approximately 33% of the Plan's total assets consist of Company Stock.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time from January 1, 2006, through the present (the "Class Period"), and whose accounts included investments in Countrywide Stock.

- 8 -

31.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can be ascertained only through appropriate discovery, plaintiff believes there are, at minimum, thousands of members of the Class who participated in or were beneficiaries of the Plan during the Class Period.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a)     whether Defendants each owed a fiduciary duty to the Plan and members of the Class;

b)     whether Defendants breached their fiduciary duties to the Plan and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

c)     whether Defendants violated ERISA; and

d)     whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

33.     Plaintiff's claims are typical of the claims of the other members of the Class because plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because  prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other

1  members of the Class or substantially impair or impede their ability to protect their
2  interests.

3      36.    Class action status is also warranted under the other subsections of Rule
4  23(b) because:

5          a)    prosecution of separate actions by the members of the Class
6  would create a risk of establishing incompatible standards of conduct for
7  Defendants;

8          b)    Defendants have acted or refused to act on grounds generally
9  applicable to the Class, thereby making appropriate final injunctive, declaratory, or
10 other appropriate equitable relief with respect to the Class as a whole; and

11         c)    questions of law or fact common to members of the Class
12 predominate over any questions affecting only individual members and a class
13 action is superior to the other available methods for the fair and efficient
14 adjudication of this controversy.

15                    **COMMON FACTUAL ALLEGATIONS**

16     37.    On July 24, 2007, Countrywide announced that it was taking a $417
17 million impairment charge and would add $292.9 million to its loan loss reserves,
18 noting that defaults were increasing in the prime market.  In reaction to this news,
19 shares of Countrywide fell 10.5% to close at $30.50 per share.

20     38.    Subsequently, on August 9, 2007, the Company warned of potential
21 short-term liquidity issues.  On this news, shares of the Company's stock tumbled
22 down even further to close at $27.86.

23     39.    Over the following weeks and months, as more bad news was revealed,
24 the price of the Company Stock tumbled down to $5.12 per share on January 9,
25 2008.  In total, the Company Stock lost approximately 89% of its value during the
26 Class Period.

27     40.    The majority of the Company's losses related to its involvement with
28 subprime mortgages.  Indeed, Countrywide's highly risky and predatory lending

practices left it overexposed to a housing bubble caused, in part, by its own participation in lending to persons unable to pay the loans unless interest rates remained low and houses continued to increase in price.

41.    According to published reports in *The Wall Street Journal* and other reputable newspapers, Countrywide was aware of the high-level of risk associated with subprime mortgages, and was engaging in these transactions irrespective of that risk.

**The Subprime Industry**

42.    Subprime mortgages are mortgages to borrowers who would not normally meet the qualifications for a loan. Many lenders were willing to provide loans to these debtors based upon the rapidly escalating price of real estate which would cover the cost of the loan should the debtor default. Lenders such as Countrywide ignored the possibility of enormous losses should the market collapse.

43.    Countrywide, like other lenders in this industry, saw rapid growth in its origination of subprime loans in recent years. Indeed, as reported in the Company's annual reports between 2003 and 2005, Countrywide's subprime mortgage portfolio doubled, from $19.8 billion to $44.6 billion.

44.    The proliferation of subprime loans has been attributed by many industry experts to a confluence of factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

45.    In order to further take advantage of this new market, lenders began weakening their underwriting standards by:

a)    reducing the minimum credit score borrowers need to qualify for certain loans;

b)    allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load;

c)   introducing new products designed to lower borrowers' monthly payments for an initial period; and

d)   allowing borrowers to take out loans with little, if any, documentation of income and assets.

46.   In addition to lowering underwriting standards, lenders began offering risky loan products to entice borrowers, which put the loans at even greater risk of defaulting than would be the case under the lower underwriting standards:

a)   No-documentation and low-documentation loans - known in the industry as "liar loans," the practice of requiring little or no documentation from borrowers constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001.

b)   Piggy-back loans – these combine a mortgage with a home-equity loan or line of credit, allowing borrowers to finance more than 80% of the home's value without paying for private mortgage insurance. As of 2006, about half of all subprime loans included "piggyback" loans, and on average all borrowers financed 82% of the underlying value of their property, markedly up from 48% in 2000.

c)   Interest-only mortgages – allow borrowers to pay interest and no principal in the loan's early years, which keep payments low for a time, but require that the deferred payment of principal be made in the future through increased monthly or balloon payments.

d)   Option adjustable-mortgages – the most prevalent of which are hybrid adjustable rate mortgages ("ARMs"), the loans are marketed with promotional or "teaser" rates during the loan's introductory period that later balloon to much higher rates once the introductory period has ended.  ARMs currently account for between one-half and one-third of subprime mortgages.

**The Risks**

47.  As early as 2004, industry watchdogs began expressing growing fears that relaxed lending practices were increasing risks for borrowers and lenders in the overheated housing market.  As lenders were making it easier for borrowers to qualify for a loan by the practices described above, they were also greatly increasing the likelihood that borrowers would be unable to make payments, and that defaults would rise.  Of particular concern was the prevalence of adjustable-rate loans in combination with the lowered lending standards.  Under lower lending standards, borrowers were either unable to repay loans unless housing prices continued to grow, or unable to pay the increased cash demands of the loan if the loan payments adjusted upward.  The combination of ARMs and lowered lending standards were more likely to result in borrowers' early payment defaults because the loans had been made originally at interest rates below prevailing rates and therefore upward payment adjustments were all but inevitable.

48.  In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well.  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a clear message to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.

49.  In mid-2005, delinquency rates for subprime loans (60-days or more past due) rose for the first time since 2002.  By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more severely – by October 2005 the delinquency rate was twice that recorded on new subprime loans a year earlier.

50.  According to the Federal Deposit Insurance Corporation ("FDIC"), total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006 and foreclosures rose from 1.47% to 2.0% over the same period.

51.    The FDIC also noted that subprime loans with ARMs accounted for the largest rise in delinquency rates, an increase from 9.83% to 14.44% between the fourth quarter of 2004 and the fourth quarter of 2006; whereas foreclosures rose from 1.5% to 2.7% during the same period.

52.    In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency, many shortly after origination.

**Countrywide Ignores The Risks**

53.    Despite the many warnings issued by industry analysts and government regulators, as well as other negative indicators, such as rising interest rates and a cooling housing market, for much of the Class Period, Countrywide continued to engage in risky and inappropriate lending practices and to make inaccurate statements about its financial future.

54.    Throughout the Class Period, Countrywide continued to expand its subprime portfolio by using many of the above-described terms to attract new borrowers.   Indeed, in 2006 alone Countrywide originated approximately $40.5 billion in subprime mortgage loans, making it one of the leading lenders in this industry.

55.    In the first quarter of 2007, the Company ranked as both the number one subprime originator and the number one subprime servicer in the country.

56.    As a result of the marked increase in its subprime portfolio, the Company also began experiencing increasing loan delinquencies.   Indeed, as reported in Countrywide's Form 10-K filed with the SEC on March 1, 2007, foreclosures for subprime loans increased to 3.53%, more than doubling the rate of 1.74% in 2004.

57.    In the same filing, the Company noted that loans pending in foreclosure comprised 0.65% of its total loans in 2006, up from 0.44% in 2005 and 0.42% in 2004.

58.    Irrespective of the high risks associated with subprime mortgages and

1   increasing defaults, it was not until late February 2007 that the Company began to

2   tighten up its origination terms.  Indeed, the Company continued to originate loans

3   comprising more than 95% of a home's appraised value and required no

4   documentation of a borrower's income until February 23, 2007.

5       59.   And it was not until March 2007, that the Company instructed its

6   brokers to stop offering borrowers the option of no-money-down home loans, or

7   "piggyback" loans, which were responsible for a steep rise in delinquencies.  In a

8   Company email Countrywide told its loan originators: "Please get in any deals over

9   95 LTV (loan-to value) today!  Countrywide BC will no longer be offering any 100

10  LTV products as of Monday, March 12."  *Countrywide Ends No Down-Payment*

11  *Lending*,        Reuters,        Mar.        9,        2007,        *available*        *at*

12  http://www.reuters.com/article/ousive/idusn0926643520070311 (last visited Jan. 15,

13  2008).

14      60.   It was not until mid-August 2007, that the Company announced it

15  would make significant changes to its operations by limiting itself to mortgages

16  which can be bought by government-backed agencies, Freddie Mac and Fannie

17  Mae.  Unfortunately it was too little, too late.

18  **The Company's Statements**

19      61.   Throughout the Class Period, Countrywide provided incomplete and

20  inaccurate information regarding the financial circumstances of the Company to

21  Plan participants and the market as a whole.

22      62.   On January 11, 2006, Countrywide released operational data for the

23  month ended December 31, 2005.  Among other things, the Company reported

24  "[m]ortgage loan fundings for the month of December were $44 billion, rising 27

25  percent from December 2004.  Mortgage loan fundings for the fourth quarter totaled

26  $133 billion, up 40 percent from last year's fourth quarter. Full year fundings

27  reached $491 billion, a new Company record and higher than any number

28  previously reported by any residential lender in the U.S."

63.   On January 31, 2006, Countrywide announced results for the quarter and year ended December 31, 2006, touting its impressive growth including quarterly and 2005 net earnings of $639 million and $2.5 billion, respectively, compared to $370 million and $2.2 billion for the comparable periods in 2004. Defendant Mozilo boasted that:

> *Importantly, we achieved these results despite an environment that included volatile interest rates; declining production profit margins throughout the industry; and the adverse effects of 2005's hurricanes, primarily Hurricane Katrina.* If not for the hurricane charges, the Company would have surpassed its record of $4.18 per diluted share, achieved in the peak refinance boom year of 2003. Countrywide's exceptional performance in the 2005 environment is a reflection of the Company's ability to generate organic market share growth in its Mortgage Banking segment, and of the effective implementation of its strategy to expand its other business segments.
>
> *As we look ahead to 2006 and beyond, we expect to see the market transition continue, which should lead to substantial industry consolidation.   In the past, Countrywide has benefited from consolidating environments by recruiting talented personnel and fortifying our infrastructure.* Just as we have done for nearly four decades, we expect to emerge from challenging times as a stronger Company that is better positioned for the future.   We continue to believe the long-term fundamentals of the housing and mortgage finance markets are strong as homeownership remains the foundation of the American dream.   *Shareholders should take comfort in knowing that Countrywide's workforce of more than 50,000 will*

1        *continue to work toward making this dream available to all*
2        *Americans.* (emphasis added)

3        64.    On February 9, 2006, Countrywide issued a press release emphasizing
4  its continued growth, including operational results for January 2006, which
5  announced that Countrywide had been named the number one mortgage originator
6  and servicer for 2005 by an industry group and had increased its origination share by
7  more than 3 percentage points from 2004 to reach 15.7% and widened its lead as the
8  number one originator.

9        65.    On March 9, 2006, Countrywide issued a press release announcing its
10  operational results for February 2006, which reflected "across-the-board growth
11  compared to February 2005."

12        66.    On April 11, 2006, Countrywide issued a press release announcing its
13  operational results for March 2006, including a growth in mortgage loan fundings of
14  $40 billion, up 10% year-over-year and 29% over the prior month. Moreover, the
15  Company reported that for the first quarter of 2006, mortgage loan fundings were up
16  13% over the first quarter of 2005 and refinance volume remained high, accounting
17  for 55% of the first quarter's production.

18        67.    On April 27, 2006, Countrywide issued a press release declaring its
19  earnings for the first quarter of 2006, including net quarterly earnings of $684
20  million and diluted earnings per share were $1.10, as compared to $689 million in
21  net earnings and $1.13 in diluted earnings per share for the first quarter of 2005, and
22  $639 million in net earnings and $1.03 in diluted earnings per share for the fourth
23  quarter of 2005. Defendant Mozilo explained that these results were achieved
24  "[d]espite the challenges created by this environment" and demonstrated the
25  "effectiveness of [Countrywide's] time-tested business model, our focus on
26  mortgage lending and the continued diversification of our earnings base." He
27  remarked further that "we remain confident in Countrywide's position within the
28  industry. We will continue to capitalize upon consolidation and other industry

dynamics to grow market share, enhance our infrastructure and create greater shareholder value."

68.    On July 13, 2006, Countrywide issued a press release announcing slowing in the mortgage loan production market as compared to the prior year, but boasted about its operational results as compared to the industry-wide rate of origination:

> Countrywide's mortgage loan production results for the month of June and the second quarter of 2006 reflected the year-over-year slowdown in activity across the industry,' said Stanford L. Kurland, President and COO. *While the Company's total mortgage loan fundings for the second quarter of 2006 declined by 3 percent year-over-year, they were up 13 percent from the first quarter of 2006, reflecting seasonal improvement.   This compared positively to the industry*, where industry origination volume for the second quarter of 2006 was estimated by various industry sources to decline, on average, by approximately 13 percent year-over-year. In addition, compared to last month, mortgage loan fundings and average daily applications increased.   The mortgage pipeline also remains strong at $65 billion, matching last month and indicative of near-term strength in funding volume for Countrywide. (emphasis added).

69.    On July 25, 2006, Countrywide issued a press release touting its positive results for the second quarter, including "a 25 percent year-over-year growth in diluted earnings per share for the second quarter despite a 121 basis point rise in the 10-Year U.S. Treasury yield and a 3 percent decline in our total loan funding volume." Defendant Mozilo, explained:

> This demonstrated the power of our business model, as the strategic counterbalancing of our Production and Servicing sectors fueled positive results in our Mortgage Banking segment.   The ongoing

growth initiatives in our other businesses are providing significant value to the consolidated franchise. ***Together, these activities help position the Company as a strong performer over the long term in a wide range of interest rate environments***. (emphasis added).

70.    On August 9, 2006, Countrywide issued a press release announcing a decline in its operational results for July 2006, which stated in part:

- Mortgage loan fundings for the month of July were $36 billion, a decrease of 19% from July 2005. Year-to-date fundings of $256 billion were essentially flat as compared to last year.

- Monthly purchase volume in July was $17 billion as compared to $21 billion for July 2005. Year-to-date purchase activity of $119 billion was down 3% from last year.

- Adjustable-rate loan fundings for the month of July were $17 billion, a decline of 27% from July 2005. Year-to-date adjustable-rate volume was $125 billion, down 10% from last year.

- Average daily mortgage loan application activity in July was $2.5 billion, a decrease of 15 percent from last year. The mortgage loan pipeline was $62 billion at July 31, 2006 as compared to $77 billion at July 31, 2005.

Defendant Kurland, attributed the results in residential mortgage loan production to current market conditions, including the slowed pace of home sales.

71.    On September 14, 2006, Countrywide again issued a press release announcing a decline in its operational results for the previous month, August 2006, as compared to the prior year. Defendant Mozilo attributed these results to the "expected industry slowdown."

72.    On October 24, 2006, Countrywide announced, "In response to changing market conditions, management has initiated an expense and headcount reduction program. By year end, we expect that this program will generate an

1  annualized cost savings run rate of over $500 million." The Company also
2  announced:

3      We anticipate the fourth quarter of 2006 will be characterized by a
4      continued slowdown in purchase volume beyond typical seasonality.
5      However, should interest rates remain at their current levels or move
6      lower, we expect that increased refinance activity will mitigate this
7      decline. We also continue to expect that margins will remain under
8      pressure and that pricing will remain competitive as the mortgage
9      market consolidates. In addition, pay-option loans – which have
10     historically provided higher margins - are declining as a percentage of
11     total production and have experienced margin erosion, and this trend
12     may continue.

13     73.   On March 12, 2007, Countrywide issued a press release announcing a
14 further decline in its operational results for February 2007 which stated in part:

15     The nonprime lending industry is currently experiencing significant
16     volatility and instability.... As a result, many nonprime competitors
17     have recently exited the market and other lenders have suggested their
18     continued viability is in question. Aggressive industry underwriting
19     guidelines and lower home price appreciation have resulted in
20     increasing delinquencies and defaults. Furthermore, as a result of
21     investor concerns about nonprime loan performance, yield
22     requirements have increased and secondary market liquidity has been
23     reduced. These factors will adversely impact residual valuations and
24     gains on sale of nonprime loans until market conditions improve.

25
26     In response to market factors, management has implemented changes to
27     our origination policies to mitigate future exposure including further
28     tightening of underwriting guidelines. Nonprime fundings were only 7

percent of total mortgage loan fundings in February and recent nonprime application volumes have declined as a result of our recent policy changes.   At December 31, 2006, our nonprime residuals amounted to $402 million, which represents 0.2 percent of the Company's assets.

*Management views that the long term impact of the current nonprime market dynamics is positive for both the industry and Countrywide....* The industry should benefit from more rational underwriting and pricing as excess lending capacity is eliminated.  Countrywide is well positioned to take advantage of this market disruption due to its experience, operating controls, strong liquidity profile and relatively low exposure to nonprime.  Nonetheless, the Company may experience short term earnings volatility during this transition period.  (emphasis added).

74.   On April 26, 2007, Countrywide announced the Company's earnings results for the first quarter.   Defendant Mozilo explained that "[w]hile the Company's core operations delivered what was otherwise a strong quarter, earnings were impacted by charges relating to our subprime activities as well as increases to our loss reserves and related asset valuation adjustments stemming from higher delinquencies and softer housing markets."  In addition, the announcement provided the following outlook for 2007:

Management believes that considerable risks remain in the mortgage marketplace, including but not limited to potential further deterioration in the housing market that could impact origination volume and future credit costs; potential pending regulatory or legislative actions that could impose constraints on our operations; and other business risks as outlined in the disclaimer at the end of this press release.  While the

balance of 2007 is expected to be challenging, management continues to believe that current market conditions will result in opportunities in the form of further industry consolidation. Management also believes that the Company is well-positioned to capitalize upon these opportunities, which should strengthen Countrywide's franchise and result in accelerated future market share and earnings growth.

75.    On June 12, 2007, Countrywide issued a press release touting its positive operational results for May 2007, including "a 17 percent increase in home purchase activity from the prior month." President and COO David Sambol attributed the results to "[Countrywide's] focus on integrating the activities of our Bank and mortgage company, Countrywide Bank funded $19 billion, or 44 percent, of total residential mortgage production during the month of May 2007, its highest monthly amount to date." Moreover, the Company announced that according to Inside Mortgage Finance, it had retained its position as the number one mortgage originator in all channels for the first quarter of 2007.

76.    On July 16, 2007, Countrywide issued a press release announcing operational results for June 2007 which stated in part:

> Market conditions became increasingly challenging throughout the second quarter of 2007, said David Sambol, President and Chief Operating Officer. The housing market continues to soften, and delinquencies and defaults continue to rise. Additionally, interest rates, price competition in the residential lending markets and secondary market volatility have all increased. ***However, Countrywide's residential funding volume in June was strong, driven primarily by seasonal purchase activity and higher application volumes in preceding months***. (emphasis added).

77.    Countrywide's announcements were attempts by the Company to hide the truth regarding a drastic need for an infusion of cash. Rather than disclose that

Company Stock had become an imprudent investment for the Plan, Defendants continued to make optimistic statements about the Company's future and, in particular, continued to make Employer Matching Contributions in Company Stock and allow Company Stock to remain an investment option in the Plan.

**Countrywide's Problems Come to Light**

78.    In July 2007, it became abundantly clear that Countrywide had ignored warnings regarding the risks of the subprime lending industry and that this failure was leading to the Company's financial demise.

79.    On July 24, 2007, Countrywide filed a Form 8-K announcing that it had taken impairment charges of $417 million during the second quarter on the Company's investments in credit-sensitive retained interests. The impairment included:

> $388 million, or approximately $0.40 in earnings per diluted share based on a normalized tax rate, of impairment on residual securities collateralized by prime home equity loans. The impairment charges on these residuals were attributable to accelerated increases in delinquency levels and increases in the estimates of future defaults and loss severities on the underlying loans.

80.    As a result of these developments, the Company updated its 2007 earnings estimate. The update cut the earnings estimate to $2.70 a share from $3.30, which was already down from its previous guidance of $3.50 to $4.30 a share. On this news Countrywide's stock price fell $3.56 or 10.4%, closing at $30.50 per share, on unprecedented volume of 51.2 million shares, a loss of over $1.87 billion in total market capitalization.

81.    On August 2, 2007, Countrywide issued a press release entitled: "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition." The press release stated in part:

> Our mortgage company has significant short-term funding liquidity

- 23 -

cushions and is supplemented by the ample liquidity sources of our bank.…   In fact, we have almost $50 billion of highly-reliable short-term funding liquidity available as a cushion today.  It is important to note that the Company has experienced no disruption in financing its ongoing daily operations, including placement of commercial paper.

Countrywide's financial condition remains strong, as evidenced by over $14 billion of net worth, significant excess capital and our strong investment grade credit ratings.…   Two independent credit rating agencies, Moody's Investors Service and Standard & Poor's Rating Service, this week re-affirmed their ratings and stable outlook for Countrywide, its bank and its mortgage company.

82.   On August 6, 2007, Countrywide filed a Form 8-K detailing the Company's liquidity sources in an unprecedented disclosure.  Upon release of these disclosures, the price of Countrywide rose 7.0% or $1.75, closing at $26.75, on volume of 50.5 million shares.

83.   On August 9, 2007, after the close of the markets, Countrywide issued its second quarter results and disclosed the Company's significant financing needs and raised questions about the short-term sufficiency and reliability of the reserves presented in its August 6, 2007 Form 8-K.  The Form 10-Q filed August 9, 2007 stated in part:

Item IA of our 2006 Annual Report presents risk factors that may impact the Company's future results.  In light of recent developments in the mortgage; housing and secondary markets, those risk factors are supplemented by the following risk factor:

*Debt and secondary mortgage market conditions could have a material adverse impact on our earnings and financial condition.*

We have significant financing needs that we meet through the capital markets, including the debt and secondary mortgage markets. These markets are currently experiencing unprecedented disruptions, which could have an adverse impact on the Company's earnings and financial condition, particularly in the short term.

Current conditions in the debt markets include reduced liquidity and increased credit risk premiums for certain market participants. These conditions, which increase the cost and reduce the availability of debt, may continue or worsen in the future. The Company attempts to mitigate the impact of debt market disruptions by obtaining adequate committed and uncommitted facilities from a variety of reliable sources. There can be no assurance however, that the Company will be successful in these efforts, that such facilities will be adequate or that the cost of debt will allow us to operate at profitable levels. The Company's cost of debt is also dependent on its maintaining investment-grade credit ratings. Since the Company is highly dependent on the availability of credit to finance its operations, disruptions in the debt markets or a reduction in our credit ratings, could have an adverse impact on our earnings and financial condition, particularly in the short term.

The secondary mortgage markets are also currently experiencing unprecedented disruptions resulting from reduced investor demand for mortgage loans and mortgage-backed securities and increased investor yield-requirements for those loans and securities. These conditions may continue or worsen in the future. In light of current conditions, we expect to retain a larger portion of mortgage loans and mortgage-backed securities than we would in other environments. While our

capital and liquidity positions are currently strong and we believe we have sufficient capacity to hold additional mortgage loans and mortgage backed securities until investor demand improves and yield requirements moderate, our capacity to retain mortgage loans and mortgage backed securities is not unlimited. As a result, a prolonged period of secondary market illiquidity may reduce our loan production volumes and could have an adverse impact on our future earnings and financial condition.

84. On August 15, 2007, Countrywide shares sank 13%, their biggest one-day decline since the 1987 stock market crash, on fears that the largest U.S. mortgage lender could face bankruptcy, spurred by a downgrade of Countrywide stock from a "Buy" recommendation to "Sell" by Merrill Lynch analyst, Kenneth Bruce. In an article by Jonathan Stempel, *Countrywide Plunges on Bankruptcy Fear*, Bruce was quoted as saying that "[i]f enough financial pressure is placed on Countrywide or if the market loses confidence in its ability to function properly, then the model can break, leading to an effective insolvency…. If liquidations occur in a weak market, then it is possible for Countrywide to go bankrupt." Reuters, Aug. 15, 2007, *available at* http://www.reuters.com/article/idusn152403520070816 (last visited Jan. 15, 2008).

85. The following day, August 16, 2007, Countrywide filed a Form 8-K announcing that it had drawn down its $11.5 billion credit facility to supplement its funding liquidity position. According to David Sambol, President and COO: "Along with reduced liquidity in the secondary market, funding liquidity for the mortgage industry has also become constrained."

86. Analysts characterized Countrywide's chosen course as a move made in desperation: "Countrywide said it would tap its $11.5 billion bank line of credit to provide liquidity. And tap is the right word, because usually a bank line like this is your liquidity source of last resort, which you use only when you're tapped out."

- 26 -

1   Randall W. Forsyth, *On Borrowed Time, Barron's Online*, Reuters, Aug. 20, 2007,

2   *available at* http://www.reuters.com/article/idusn152403520070816 (last visited Jan.

3   15, 2008).

4        87.   Upon news of the downgrade and the announcement that the Company

5   had drawn down its entire credit facility, Countrywide shares tumbled and closed at

6   $18.95 per share, a decline of 42 percent from the start of the Class Period.

7        88.   As of August 17, 2007, Countrywide began laying off employees

8   involved in loan origination – only two weeks after it reported hiring loan officers

9   from rivals forced to close shop.  James R. Hagerty, *Countrywide Begins Staff*

10  *Layoffs*, Wall St. J., Aug. 20, 2007, at A6.

11       89.   On August 22, 2007, Countrywide issued a press release in which the

12  Company announced that it had received a much needed infusion of cash in the form

13  of a $2 billion equity investment from Bank of America.  The investment is in the

14  form of a non-voting convertible preferred security yielding 7.25% annually.  Under

15  the terms of the agreement, the security can be converted into common stock at $18

16  per share, with resulting shares subject to restrictions on trading for 18 months after

17  conversion. Defendant Mozilo, in the Company's press release, stated in part:

18        Bank of America's investment in Countrywide represents a vote of

19        confidence and strengthens our balance sheet, enabling us to position

20        Countrywide for future growth and success.  This transaction benefits

21        all of Countrywide's constituents, including investors, shareholders,

22        mortgage customers, deposit holders, business partners and employees.

23       90.   The investment by Bank of America was supposed to strengthen

24  Countrywide's financials, but was met with skepticism in the market.  "Two billion

25  dollars from Bank of America is not a lot compared to what they may need," said

26  Stuart Plesser, an equity analyst at Standard & Poor's in New York. James R.

27  Hagerty and Karen Richardson, *Why is Countrywide Sliding? It's Unclear, That's*

28  *the Issue*, Wall St. J., Aug. 29, 2007.

91.   On September 7, 2007, Countrywide issued a press release announcing that it would cut up to 12,000 additional jobs, amounting to as much as 20% of the Company's workforce.  In the same press release the Company announced plans to revise its product offerings to include only high quality prime loans or loans that can be sold in the secondary market.

92.   On September 11, 2007, it was announced that Countrywide had hired Goldman Sachs Group, Inc. to help it find additional financing for the second time in less than a month. Steve Dickson, *Countrywide Shares Fall on Report Lender Needs Cash*, Bloomberg News, Sept. 11, 2007. As a result of this news, Company Stock fell 5% to $16.18, its lowest closing price in four years.

93.   On September 13, 2007, the Company announced that it had secured an additional $12 billion in secured borrowing through new or existing credit lines. Lingling Wei, *Countrywide Loan Fundings Fall; Lender Lines Up $12 Billion Credit*, Wall St. J., Sept. 13, 2007.

**Defendants Knew or Should Have Known That**
**Countrywide Stock Was an Imprudent Investment**

94.   Throughout the Class Period Defendants knew or should have known that Countrywide stock was imprudent investment alternatives for the Plan.

95.   As a result, Countrywide's stock price and the price of the Fund were artificially inflated making them an imprudent investment for the Plan.

96.   As a result of Defendants' knowledge of the public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Countrywide Stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company Stock.

97.   Defendants also failed to take into account the changing risk profile of the Countrywide Stock investment as a result of the above circumstances and the

Company's deteriorating financial circumstances as demonstrated by objective indicators for evaluating a company's ongoing viability.

98.   The Defendants failed to conduct an appropriate investigation into whether Countrywide stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Countrywide's tremendous problems so that participants could make informed decisions regarding their investments in Countrywide stock in the Plan.

99.   An adequate or even cursory investigation by Defendants would have revealed to a reasonable fiduciary that, under these circumstances, investment by the Plan in Countrywide Stock was excessively and unduly risky, and, thus, imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

100.   Because Defendants knew or should have known that Countrywide was not a prudent investment option for the Plan, they had a fiduciary duty to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Countrywide stock.

101.   Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures, as necessary; divesting the Plan of Countrywide Stock; discontinuing further contributions to and/or investment in Countrywide Stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Countrywide they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Countrywide stock.

102.   Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's

investment in Countrywide Stock.  In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company Stock even as Countrywide's problems came to light.

103.   In addition, the Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

104.   When it came to their own personal holdings of Countrywide Stock, however, the Defendants sold millions of dollars of the stock, effectively cashing in while disregarding their fiduciary duties to the Plan.  Such conduct violated the duties of prudence and loyalty under ERISA.

## CAUSATION

105.   The Plan suffered at least tens of millions of dollars in losses because substantial assets of the Plan were imprudently allowed to be put at great risk by Defendants, through investment by the Plan in Countrywide Stock during the Class Period, in breach of Defendants' fiduciary duties.

106.   Defendants are responsible for losses caused by participant direction of investment in Countrywide Stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision making process, as required by ERISA §404(c), 29 U.S.C. §1104(c), and the regulations promulgated thereunder.   Defendants concealed material and non-public facts from participants and provided misleading, inaccurate, and incomplete information to them regarding the nature of the Defendants' improper activities and therefore the ongoing earnings levels of Countrywide, as well as the true underlying values of Countrywide Stock offered by the Plan, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in Countrywide Stock and Defendants remain liable under ERISA for losses caused by such investment.

107.  Where a breach of fiduciary duty consists of or includes misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.

108.  Defendants' statements, acts, and omissions alleged herein constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Countrywide Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of its plan assets in Countrywide Stock during the Class Period.  Plaintiff and the other Class members are therefore presumed to have relied to their detriment on Defendants' deceptive statements, acts, and omissions.

109.  Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Countrywide Stock, eliminating Countrywide Stock as an investment option when it became imprudent, and divesting the Plan from Company Stock offered by the Plan when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Countrywide Stock.

## ERISA §404(C) DEFENSE INAPPLICABLE

110.  ERISA §404(c), 29 U.S.C. §1104(c), is an affirmative defense inapplicable here.  ERISA §404(c) provides a limited exception to fiduciary liability for losses that result from Plan participants' exercise of "independent control" over investment decisions.  ERISA §404(c) thus applies only when plan participants in fact exercise independent control over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of the statute and the regulations promulgated pursuant thereto.

111.  There are several reasons why ERISA §404(c) is inapplicable here. First, ERISA §404(c) does not provide any defense to the Plan's fiduciaries'

imprudent decision to select and continue offering Countrywide Stock as investment option in the Plan or to continue matching in Countrywide Stock – both of which are decisions that are completely out of the Plan's participants' control.  Neither of those decisions was made or controlled by the Plan's participants.

112.  Second, even as to participant directed investment in Countrywide Stock, ERISA §404(c) does not apply because Defendants failed to ensure effective participant control by neglecting to provide complete and accurate material information to the Plan's participants regarding Countrywide Stock.  Due to Defendants' failure in this respect, the Plan's participants did not have informed control over the portion of the Plan's assets that were invested in Countrywide Stock at their direction, and Defendants remain entirely responsible for losses arising therefrom.

113.  As a result, ERISA §404(c) is inapplicable.

## COUNT I

### Breach of Fiduciary Duty of Loyalty to Avoid Conflicts of Interest
### ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A)

114.  Plaintiff incorporates the allegations set forth in paragraphs 1 through 112 of this Complaint as is fully set forth herein.

115.  At all relevant times, ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A), required Defendants to act solely in the interests of the Plan participants and beneficiaries, including plaintiff, and for the exclusive purpose of providing benefits to the Plan participants and beneficiaries.

116.  The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single minded devotion to the interests of the Plan and its participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan sponsor.

117.  Defendants breached their duty of loyalty owed to the Plan and the

1  Class members.

2      118.  Upon information and belief, many of the Defendants have received

3  Countrywide Stock pursuant to incentive and nonqualified stock options and

4  restricted share awards.

5      119.  Thus, Defendants had a significant personal financial incentive to

6  maintain a high price for Countrywide Stock.

7      120.  Defendants had an incentive not to disclose negative financial results to

8  the Plan participants in hopes that such participants would select Countrywide Stock

9  for their retirement accounts and therefore help maintain a high price for

10  Countrywide Stock.

11      121.  Defendants also had an incentive to maintain Countrywide Stock as an

12  investment option under the Plan.  If Company Stock were eliminated as an

13  investment option under the Plan, this would have sent a negative signal to Wall

14  Street analysts, which in turn would result in reduced demand for Countrywide

15  Stock and a drop in the stock price.  Since the compensation of certain Defendants

16  included Countrywide Stock, this sequence of events would reduce their

17  compensation and also reduce their profits from selling Countrywide Stock.

18      122.  As such, Defendants breached their fiduciary duty of loyalty because

19  they were faced with a conflict of interest, which they did not promptly resolve,

20  between their own interest and the interests of the Plan participants and

21  beneficiaries.  Defendants' interest in maintaining an artificially high price for

22  Countrywide Stock was in direct conflict with Plan participants' interests in (i)

23  avoiding investing their retirement accounts in Countrywide Stock when it was

24  imprudent to do so and (ii) receiving accurate information concerning Countrywide

25  upon which to base their investment decisions.

26      123.  Defendants also breached their fiduciary duty of loyalty because they

27  endorsed unreasonable growth estimates for Countrywide.  Such endorsement was

28  in the interests of Defendants to maintain an artificially high price for Countrywide

1  Stock, but was detrimental to the interests of the Plan participants and beneficiaries
2  who were holding and continuing to invest in Countrywide Stock based upon
3  misinformation.

4      124.   Defendants also breached their fiduciary duty of loyalty because they
5  did not timely disclose negative financial information about the declining value of
6  the Company's investments in subprime securities.  Such non-disclosure aided the
7  interests of the Defendants in maintaining an artificially high price for Countrywide
8  Stock, but ran against the interests of the Plan participants and beneficiaries who
9  were holding and continuing to invest in Countrywide Stock based upon
10 misinformation.

11     125.   As a direct and proximate result of the breaches of fiduciary duties
12 alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and
13 beneficiaries, not only lost a significant portion of its retirement investments, but
14 also failed to achieve the gains that the Plan, and indirectly the Class, would have
15 realized had Defendants performed their fiduciary duties.

16     126.   Pursuant to ERISA §§409(a) and 502(a)(1)(B), 29 U.S.C. §§1109(a)
17 and 1132(a)(1)(B), Defendants are liable to restore the injury to the Plan caused by
18 their breaches of fiduciary duties alleged in this Count.

19                          **COUNT II**
20                  **Breach of Fiduciary Duty of Care**
21           **ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B)**

22     127.   Plaintiff incorporates the allegations set forth in paragraphs 1 through
23 126 of this Complaint as is fully set forth herein.

24     128.   At all times relevant hereto, ERISA §404(a)(1)(B), 29 U.S.C.
25 §1104(a)(1)(B), required Defendants to act, with respect to the Plan, with the care,
26 skill, prudence, and diligence that a prudent person acting in a like capacity and
27 familiar with such matters would use in managing an enterprise of like character and
28 with like aims.

129.   During the Class Period, Defendants breached their duty of care.  They failed to act prudently and failed to use reasonable care, skill, or diligence in offering Countrywide Stock as an investment option, purchasing Countrywide Stock for the Plan, monitoring the Plan's investment in Countrywide Stock, and communicating information concerning Countrywide's financial performance to Plan participants and beneficiaries, and holding Countrywide Stock when it was no longer a prudent retirement investment.

130.   Countrywide Stock was an imprudent Plan investment because:

a)-   Countrywide was aware of the high-level of risk associated with subprime mortgages;

b)   In the face of the clear signs of turmoil in mortgage market, Countrywide continued to increase its exposure to subprime mortgages;

c)   Defendants distributed misinformation concerning Countrywide's exposure the subprime mortgage market;

d)   The Company knew or should have known that it would be forced to write down its bad investments; and

e)   The Company lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Company.

131.   At all relevant times, Defendants knew or should have known by virtue of their status as officers or senior employees of the above-mentioned facts, all of which made Countrywide Stock an imprudent Plan investment.

132.   Defendants also knew that the price of Company Stock would trade at a discount once the market became aware that the Company had overstated earnings growth.   Yet, Defendants failed to impute this knowledge to the Plan and Plan participants and continued to cause the Plan to acquire and retain shares of Company Stock.

133.   Defendants failed to properly take into account the numerous practices that put Countrywide Stock at risk as well as the fact that Countrywide Stock was

inflated in value when determining the prudence of investing and holding Plan assets in Countrywide Stock.

134.   As a result of Defendants' knowledge of and, at times, participation in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification issues made to Plan participants did not effectively inform Plan participants of the past, immediate, and future dangers of investing in Company Stock.

135.   Because Defendants knew or should have known that Company Stock was an imprudent investment for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and reasonably foreseeable losses incurred as a result of the Plan's investment in Company Stock.

136.   Defendants had available to them several different options for satisfying this duty, including: making appropriate disclosures as necessary; divesting the Plan of Company Stock; precluding additional investment in Company Stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company Stock.

137.   Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of Plan investment in Countrywide Stock.

138.   Upon information and belief, the Plan Committee and its members were responsible for the selection, maintenance, and monitoring of the Plan's investments.

139.   Under ERISA, Defendants were responsible for ensuring that all Plan investments in Company Stock were prudent and are liable for losses incurred as a result of such investments being imprudent.

140.   Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA §404(a)(l)(D), 29 U.S.C. §1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the Plan, to do so.

141.   Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, these Defendants knew or should have known that Countrywide Stock was not a suitable and appropriate investment for the Plan.  Nonetheless, during the Class Period, these fiduciaries continued to offer the Countrywide Stock as an investment for the Plan and to direct and approve Plan investment in Countrywide Stock.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Countrywide Stock.

142.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, not only lost a significant portion of its assets and retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

143.   Pursuant to ERISA §§409 and 502(a), 29 U.S.C. §§1109(a) and 1132(a), Defendants are liable to restore the injury to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Breach of Fiduciary Duty to Provide Complete and Accurate Information
### ERISA §§404(a)(1)(A) and (B), 29 U.S.C. §§1104(a)(1)(A) and (B)

144.   Plaintiff incorporates the allegations set forth in paragraphs 1 through

143 of this Complaint as is fully set forth herein.

145. The fiduciary duties of loyalty and prudence also entail a duty to deal candidly with Plan participants and beneficiaries. This duty of candor requires Plan fiduciaries to provide complete and accurate information concerning the Plan's investment options, including the financial performance of Countrywide, to Plan participants and beneficiaries. This duty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or Plan assets, and to disclose material information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all Plan investment options, including investment in Countrywide Stock.

146. Because investment in the Plan was not diversified (*i.e.*, the Defendants chose to invest the Plan's assets and/or allow those assets to be invested heavily in Countrywide Stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Countrywide Stock.

147. The Defendants breached their duty to disclose material information to Plan participants and beneficiaries by failing to provide complete and accurate information regarding Countrywide Stock, Countrywide's business improprieties, public misrepresentations, inflated earnings and growth estimates, and the consequent artificial inflation of the value of Countrywide Stock. Defendants also failed to convey accurate information regarding the soundness of Countrywide Stock and the prudence of investing retirement contributions in Countrywide equity. These failures were particularly devastating to the Plan, and thus Plan participants

1   and beneficiaries, because losses in Countrywide Stock had an enormous impact on

2   the value of participants' retirement assets.

3        148.  Upon information and belief, the Company regularly communicated

4   with employees, including participants in the Plan, about the performance and

5   prospects of both the Company and Company Stock.  During the Class Period, the

6   Company fostered a positive attitude toward Company Stock and/or allowed

7   participants in the Plan to follow their natural bias towards investment in the

8   equities of their employer by not disclosing negative material information

9   concerning investment in Company Stock.  As such, participants in the Plan could

10   not appreciate the true risks presented by investments in Company Stock and

11   therefore could not make informed decisions regarding their investments in the Plan.

12        149.  Defendants failed to provide Plan participants with material

13   information regarding Countrywide Stock, such that the participants could

14   appreciate the true risks presented by investments in Countrywide Stock and could

15   make informed decisions regarding investments in the Plan.

16        150.  Where a breach of fiduciary duty consists of, or includes,

17   misrepresentations and omissions material to a decision by a reasonable Plan

18   participant that results in harm to the participant, the participant is presumed as a

19   matter of law to have relied upon such misrepresentations and omissions to his or

20   her detriment.  Here, the above described statements, acts, and omissions of the

21   Defendants in this Complaint constituted misrepresentations and omissions that

22   were fundamentally deceptive concerning the prudence of investments in

23   Countrywide Stock and were material to any reasonable person's decision about

24   whether or not to invest or maintain any part of their invested Plan assets in

25   Countrywide Stock during the Class Period.  Plaintiff and the other Class members

26   are therefore presumed to have relied to their detriment on the misleading

27   statements, acts, and omissions of the Defendants as described herein.

28        151.  As a direct and proximate result of the breaches of fiduciary duties

alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries not only lost a significant portion of its retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

152. Pursuant to ERISA §§409 and 502(a), 29 U.S.C. §§1109(a) and 1132(a), Defendants are liable to restore the injury to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Fiduciary Duty to Monitor

### ERISA §§404(a)(1)(A) and (B), 29 U.S.C. §§1104(a)(1)(A) and (B)

153. Plaintiff incorporates the allegations set forth in paragraphs 1 through 152 of this Complaint as is fully set forth herein.

154. At all relevant times, ERISA §§404(a)(1)(A) and (B), 29 U.S.C. §§1104(a)(1)(A) and (B), required Defendants to monitor other fiduciaries.

155. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that meant that Defendants had the duty to:

a)   ensure that the monitored fiduciaries possessed the needed credentials and experience or used qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan participants;

b)   ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

c)   ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

d)   ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan investments;

e)   ensure that the monitored fiduciaries maintained adequate

- 40 -

records of the information on which they based their decisions and analysis with respect to Plan investment options; and

f)    ensure that the monitored fiduciaries reported regularly to the Company.

156.   The monitoring fiduciaries must then review, understand, and approve the conduct of the hands on fiduciaries.

157.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.  The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

158.   The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

159.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

160.   Defendants breached their duties to monitor the members of the Plan Committee, over whom they had authority to appoint, remove, and replace.

161.   Defendants breached these fiduciary monitoring duties by, among other

things: (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's true financial performance and growth prospects; and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified Countrywide Stock fund. Defendants knew or should have known that the members of the Plan Committee were imprudently allowing the Plan to continue offering the Countrywide Stock as a Plan investment, and to continue investing in Countrywide Stock when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

162. In addition, Defendants, as fiduciaries responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Plan Committee to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

163. Defendants either failed to conduct an appropriate investigation into whether Countrywide Stock was a prudent investment for the Plan or disregarded the information learned from such investigation, that Countrywide Stock was an imprudent investment, in breach of their fiduciary duties. In connection with the lack of or disregard of an appropriate investigation, Defendants failed to provide the Plan participants with information regarding Countrywide's true financial condition so that Plan participants could make informed decisions regarding Countrywide Stock in the Plan. Defendants failed to protect the Plan and its participants against inevitable losses.

164. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries not only lost a significant portion of its retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

165. Pursuant to ERISA §§409 and 502(a), 29 U.S.C. §§1109(a) and

1132(a), Defendants are liable to restore the injury to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability

### ERISA §405(a), 29 U.S.C. §1105(a)

166.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 165 of this Complaint as is fully set forth herein.

167.   ERISA §405(a), 29 U.S.C. §1105(a), may impose liability upon a fiduciary for a breach of fiduciary responsibility committed by another fiduciary.

168.   Each Defendant is also liable as a co fiduciary because each: (1) knowingly participated in and knowingly undertook to conceal (i) the failure of the other fiduciaries to provide complete and accurate information regarding Countrywide Stock, (ii) the conflict of interest facing the other fiduciaries, (iii) the failure to monitor and investigate Plan investments, (iv) the imprudence of the Plan investing in Countrywide Stock, and (v) the failure to diversify the Plan investments; (2) enabled other fiduciaries to breach their duties as a result of each Defendant's own failure to satisfy his or her fiduciary duties; and (3) had knowledge of the other fiduciaries' failures to satisfy their fiduciary duties, yet did not make any effort to remedy the breaches.

169.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its retirement investments.

170.   Pursuant to ERISA §§409 and 502(a), 29 U.S.C. §§1109(a) and 1132(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

171.   The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have

- 43 -

1   known that the Plan's assets should not have been so heavily invested in Company
2   Stock.

3       172.   As a consequence of the Defendants' breaches, the Plan suffered
4   significant losses.

5       173.   ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) authorizes a plan participant
6   to bring a civil action for appropriate relief under ERISA §409, 29 U.S.C. §1109.
7   Section 409 requires "any person who is a fiduciary … who breaches any of the …
8   duties imposed upon fiduciaries … to make good to such plan any losses to the
9   plan…." Section 409 also authorizes "such other equitable or remedial relief as the
10   court may deem appropriate…."

11      174.   With respect to calculation of the losses to a plan, breaches of fiduciary
12   duty result in a presumption that, but for the breaches of fiduciary duty, the
13   participants and beneficiaries in the plan would not have made or maintained its
14   investments in the challenged investment and where alternative investments were
15   available, that the investments made or maintained in the challenged investment
16   would have instead been made in the most profitable alternative investment
17   available.  In this way, the remedy restores the value of the plan's assets to what
18   they would have been if the plan had been properly administered.

19      175.  Plaintiff and the Class are therefore entitled to relief from the
20   Defendants in the form of: (1) a monetary payment to the Plan to make good to the
21   Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged
22   above in an amount to be proven at trial based on the principles described above, as
23   provided by ERISA §409(a), 29 U.S.C. §1109(a); (2) injunctive and other
24   appropriate equitable relief to remedy the breaches alleged above, as provided by
25   ERISA §§409(a) and 502(a)(2 3), 29 U.S.C. §§1109(a) and 1132(a)(2 3); (3)
26   reasonable attorney fees and expenses, as provided by ERISA §502(g), 29 U.S.C.
27   §1132(g), the common fund doctrine and other applicable law; (4) taxable costs and
28   (5) interests on these amounts, as provided by law; and (6) such other legal or

1 | equitable relief as may be just and proper.

2 | <u>**PRAYER FOR RELIEF**</u>

3 | **WHEREFORE**, plaintiff prays for judgment against Defendants, jointly,
4 | severally, or individually, in the alternative, as follows:

5 | A.    declaration that Defendants, and each of them, have breached their
6 | ERISA fiduciary duties to the Plan participants;

7 | B.    an order compelling the Defendants to make good to the Plan all losses
8 | to the Plan resulting from Defendants' breaches of their fiduciary duties, including
9 | losses to the Plan resulting from imprudent investment of the Plan's assets, and to
10 | restore to the Plan all profits the Defendants made through use of the Plan's assets,
11 | and to restore to the Plan all profits which the participants would have made if
12 | Defendants had fulfilled their fiduciary obligations;

13 | C.    imposition of a constructive trust on any amounts by which any
14 | Defendant was unjustly enriched at the expense of the Plan as the result of breaches
15 | of fiduciary duty;

16 | D.    an order enjoining Defendants, and each of them, from any further
17 | violations of their ERISA fiduciary obligations;

18 | E.    actual damages in the amount of any losses the Plan suffered, to be
19 | allocated among the participants' individual accounts in proportion to the accounts'
20 | losses;

21 | F.    an order that Defendants allocate the Plan's recoveries to the accounts
22 | of all participants who had any portion of their account balances invested in
23 | Company Stock maintained by the Plan in proportion to the accounts' losses
24 | attributable to the decline in the price/value of Company Stock;

25 | G.    an order awarding costs pursuant to 29 U.S.C. §1132(g);

26 | H.    an order awarding attorneys' fees pursuant to 29 U.S.C. §1132(g) and
27 | the common fund doctrine; and

28 |

1    I.    an order for equitable restitution and other appropriate equitable

2  monetary relief against the Defendants.

3                              **DEMAND FOR JURY TRIAL**

4          Plaintiff demands a trial by jury on all issues so triable.

5  DATED: January 15, 2008                WOLF HALDENSTEIN ADLER
6                                            FREEMAN & HERZ, LLP
                                           FRANCIS M. GREGOREK
7                                          BETSY C. MANIFOLD
                                           RACHELE R. RICKERT
8                                          MARISA C. LIVESAY

9                                          *Rachele R. Rickert*

10                                            RACHELE R. RICKERT

11                                         Symphony Towers
12                                         750 B Street, Suite 2770
                                           San Diego, California 92101
13                                         Telephone:  619/239-4599
                                           Facsimile:  619/234-4599

14                                         LAW OFFICES OF BRUCE MURPHY
15                                         BRUCE G. MURPHY, ESQ.
                                           265 Llwyds Lane
16                                         Vero Beach, Florida 32963
                                           Telephone:  828/737-0500
17                                         bgm@brucemurphy.biz

18                                         Attorneys for Plaintiff and the Class

19

20

21

22

23

24

25

26

27

28  | COUNTRYWIDE:15626

                                      - 46 -